1  Brody A. McBride (CA SBN 270852)
2  2011 Palomar Airport Road, Suite 101
   Carlsbad, CA 92011
3  (760) 253-1231
   brody@brodymcbride.com

4  Trenton G. Lamere (CA SBN 272760)
5  122 Mascoutah Avenue
   Belleville, IL 62220
6  (618) 539-2328
   trenton@lamerelegal.com

7  Attorneys for Plaintiff Alba Marroquin de Portillo

8              **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10 | ALBA MARROQUIN DE PORTILLO,          | Case No. **'23 CV 0978 WQH WVG**
   | individually and as successor in interest to |
11 | her deceased son, Lester Daniel Marroquin, |
   |                                       |
12 |              Plaintiff,               | **COMPLAINT**
   |                                       |
13 |                 v.                    | **DEMAND FOR JURY TRIAL**
   |                                       |
14 | COUNTY OF SAN DIEGO and DOES 1-      |
   | 20, inclusive,                        |
15 |                                       |
   |              Defendants.              |
16 |                                       |

17

18 / / /

19 / / /

20 / / /

21

22

23

24

25

26

27

28

                              1
COMPLAINT

1
2

# **TABLE OF CONTENTS**

3   **I.      INTRODUCTION** ................................................................3

4   **II.     JURISDICTION, VENUE, AND CLAIMS** ..........................4

5   **III.    PARTIES** .....................................................................5

6   **IV.     FACTS** .......................................................................5

7           **A.  Jail Staff's Reckless Indifference to Mr. Marroquin's Serious Medical**

8               **Needs** ..................................................................5

9           **B.  County's Deliberate Indifference to Inmate Safety in County Jails** ..........9

10              **i.    Disability Rights California's Findings and Recommendations** ..........9

11              **ii.   National Center on Institutions and Alternatives' Findings and**

12                     **Recommendations** ............................................10

13              **iii.  California State Auditor's Findings and Recommendations** .............12

14              **iv.   County's Pattern and Practice of Failing to Keep Inmates Safe** .......13

15          **C.  Mr. Marroquin's Wrongful Death** ........................................17

16  **V.     CAUSES OF ACTION** .......................................................18

17         **FIRST CAUSE OF ACTION – 42 U.S.C. § 1983 – Violation of Fourteenth**

18              **Amendment – Deliberate Indifference to Serious Medical Needs** ...........18

19         **SECOND CAUSE OF ACTION – 42 U.S.C. § 1983 – Violation of Fourteenth**

20              **Amendment – Interference with Familial Relations** .......................19

21         **THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 – *Monell* Liability** ............20

22         **FOURTH CAUSE OF ACTION – Wrongful Death** .........................22

23  **VI.    PRAYER FOR RELIEF** .....................................................22

24  **VII.   DEMAND FOR JURY TRIAL** .............................................23

25
26
27
28

COMPLAINT

# I.   INTRODUCTION

1.   Lester Daniel Marroquin was a beloved son, nephew, cousin, and friend. Those closest to him called him "Danny."  Inspired by his devotion to Christianity, Danny was often a light in the lives of those around him, even when his struggles with mental health made this difficult.

2.   On May 30, 2021, Mr. Marroquin was a pretrial detainee in the San Diego County Central Jail.  On that day, jail staff knew Mr. Marroquin had a history of mental illness and self-harming behavior, and was an ongoing danger to himself, in part because voices in his head were telling him to continually drink water from the toilet.

3.   As such, Mr. Marroquin should have been in Enhanced Observation Housing ("EOH"), with safety checks conducted at least every fifteen minutes.

4.   Instead, jail staff recklessly transferred Mr. Marroquin from a safety cell, where he had been continuously monitored, to a minimally monitored cell in Administrative Segregation ("Ad-Seg") with the means for Mr. Marroquin to harm himself—including a toilet with running water.  Ad-Seg cells require checks only once per hour.

5.   Between checks, Mr. Marroquin predictably began drinking water from the toilet, motivated by hallucinations and delusions.  He believed he could somehow communicate with his mom through these interactions with the toilet.  And these beliefs became more extreme as jail staff cut off contact between Mr. Marroquin and his mom.

6.   When jail staff next checked on Mr. Marroquin, it was too late.  Mr. Marroquin had consumed so much water, he died from acute water intoxication.

7.   Mr. Marroquin should have been admitted to an inpatient facility where he could have received the psychiatric care he required.  Instead, he was repeatedly transferred in and out of the jail's safety cells and EOH, never actually receiving the treatment he needed.

8.   Mr. Marroquin's death was preventable.  Had the Sheriff's Department implemented, for example, one of its own consultant's recommendations—that Ad-Seg

3

safety checks be conducted every half hour, rather than every hour—it is more likely than not that Mr. Marroquin would still be alive today.

9.    Mr. Marroquin's mother, Plaintiff Alba Marroquin de Portillo, now sues the County of San Diego and Does 1-20, inclusive, for damages, pursuant to 42 U.S.C. § 1983 and California state law.

## II.    JURISDICTION, VENUE, AND CLAIMS

10.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, as Plaintiff asserts causes of action arising under 42 U.S.C. § 1983, in addition to a California cause of action that arises from the same controversy giving rise to Plaintiff's federal claims.

11.    The Court has personal jurisdiction over all Defendants in this action, as all Defendants are and were, at all times relevant to this complaint, situated, regularly conduct business, and/or are and were domiciled in the State of California.

12.    Venue is proper in this district, as the events giving rise to this action occurred in the County of San Diego, California, which is located within this judicial district.

13.    Plaintiff has complied with the California Government Code requirements to assert state-law causes of action and has, in particular, submitted a tort claim for damages to the County, which the County denied by letter dated November 29, 2021.  Within six months, on May 24, 2022, Plaintiff filed a lawsuit (3:22-cv-00744-BAS-RBB), which was subsequently dismissed without prejudice due to the incapacitating grief Plaintiff felt over the death of her son, followed by a severe case of pneumonia that required Plaintiff to be hospitalized from November 11, 2022, through January 18, 2023, and subsequently placed in a rehabilitation facility.  Once no longer incapacitated by grief or illness in February 2023, Plaintiff immediately resumed prosecution of her case.  And from March 2023 through May 19, 2023, Plaintiff diligently arranged and participated in pre-litigation mediation efforts.  When those efforts were unsuccessful, Plaintiff filed this complaint. Ms. Marroquin has, in short, pursued this lawsuit as diligently as humanly possible.

/ / /

COMPLAINT

# III.   PARTIES

14.     Plaintiff Alba Marroquin de Portillo ("Plaintiff" or "Ms. Marroquin") is and was, at all times relevant to this complaint, an individual domiciled in California.  Ms. Marroquin was decedent Lester Daniel Marroquin's mother.  In addition to suing individually for damages arising from Mr. Marroquin's death, Ms. Marroquin sues as Mr. Marroquin's sole successor in interest to prosecute those claims which survived Mr. Marroquin's death.  *See* Cal. Civ. Proc. Code § 377.30.

15.     Defendant County of San Diego ("County") is and was, at all times relevant to this complaint, a municipal entity duly organized under California law.  The San Diego County Sheriff's Department ("Sheriff's Department") is the chief law enforcement agency for the County.  The Sheriff's Department manages and operates the San Diego Central Jail ("Central Jail") and was, at all times relevant to this complaint, responsible for the policies, procedures, practices, and customs of the Central Jail, as well as for the hiring, training, supervision, discipline, actions, and inactions of the County's agents and/or employees working in the Central Jail.

16.     Defendants Does 1 through 20, inclusive, are persons whose identities, titles, and employment/agency relationships are currently unknown to Ms. Marroquin; that is, she is currently ignorant of the true names of these persons.  These defendants include jail staff, detention officers, medical staff, medical providers, supervisors, employees, agents, contractors, and final policymakers who substantially contributed to the acts and omissions giving rise to the damages claimed herein.  These defendants each acted under color of state law, within the scope of their agency and/or employment, and with the full knowledge and consent, either express or implied, of their principal and/or employer.  Ms. Marroquin will seek leave to substitute the true names of these defendants when she learns their true identities.

# IV.   FACTS

## A.   Jail Staff's Reckless Indifference to Mr. Marroquin's Serious Medical Needs

17.     From December 18, 2020, through May 30, 2021, Mr. Marroquin was a

5

COMPLAINT

pretrial detainee in the County's custody at the Central Jail.

18.    For the two years leading up to Mr. Marroquin's incarceration, he struggled with mental health issues.  In particular, he had persistent delusions and hallucinations that someone was going to hurt his mother.  Unable to get the help he needed, Mr. Marroquin's mental health struggles led him directly into the criminal legal system.  Mr. Marroquin would be taken into custody, stabilized with medications, then released without resources to maintain his stability, only to begin the cycle again.

19.    Throughout all of this, Mr. Marroquin and his mom remained a constant source of healing and comfort to one another.  They maintained frequent contact—particularly because Mr. Marroquin's mental health depended so heavily on knowing his mother was safe.  Even when he was incarcerated, Ms. Marroquin and her son remained as close as possible.  They talked almost daily on the phone, and Ms. Marroquin would make long trips to visit her son in person wherever he was located, even if only for an hour.  When they spent time together, they would listen to gospel music and talk about their favorite Bible verses.

20.    In fact, one of the reasons Mr. Marroquin's mental health declined during his final months in Central Jail was because jail staff increasingly cut off Mr. Marroquin's contact with his mom.  This exacerbated Mr. Marroquin's condition, as his mom was one of the few people that could ease his mind.  And on the other side of that coin, Mr. Marroquin was one of the few people who could always light up his mom's world.

21.    Shortly after his booking in Central Jail, in December 2020, Mr. Marroquin had an interaction with jail deputies where Mr. Marroquin was shot with a taser.  After ripping out one of the taser barbs and attempting to hurt himself, Mr. Marroquin was placed into a safety cell.

22.    A "safety cell" is the most restrictive type of cell in which an individual who is a danger to themselves might be placed in Central Jail.  The cells are small, windowless rooms with rubberized walls.  There is no sink, toilet, furniture, or bedding, leaving the individual to sit or lie on the floor.  A grate in the middle of the floor serves as a toilet.

6

Safety cells have a ceiling light that is illuminated 24/7, and a camera for remote observation by custody staff. Individuals are given only a "safety smock" made from heavy tear-free material fastened with straps or Velcro. Individuals are not allowed any personal property while in a safety cell.

23. On or about January 9, 2021, Mr. Marroquin was placed in a safety cell after injuring his head. He reported that auditory hallucinations were directing him to bang his head on his cell wall.

24. On February 3, 2021, at the request of Mr. Marroquin's public defender, the state criminal court ordered Mr. Marroquin to undergo a psychiatric evaluation, to be conducted on March 4, 2021. The Sheriff's Department did not make Mr. Marroquin available for this evaluation.

25. On or about March 13, 2021, Mr. Marroquin was again placed in a safety cell due to self-harming behavior.

26. On March 18, 2021, Mr. Marroquin's psychiatric evaluation still had not been completed, so the state court continued the criminal proceedings to April 12, 2021.

27. On March 23, 2021, a court-appointed psychiatrist attempted to conduct a remote video evaluation of Mr. Marroquin. Jail staff failed to produce Mr. Marroquin for the evaluation.

28. On or about March 24, 2021, Mr. Marroquin was again placed in a safety cell due to self-harming behavior. Jail staff had again discovered Mr. Marroquin banging his head on his cell wall.

29. On April 5, 2021, the court-appointed psychiatrist again attempted to conduct a remote video evaluation of Mr. Marroquin. Jail staff failed to produce Mr. Marroquin for his evaluation.

30. On April 12, 2021, Mr. Marroquin's psychiatric evaluation still had not been completed, so the state criminal court ordered the Sheriff's Department to produce Mr. Marroquin for a psychiatric evaluation at the courthouse on April 30, 2021. The Sheriff's Department did not produce Mr. Marroquin for this evaluation.

COMPLAINT

31.     On or about April 25, 2021, Mr. Marroquin was again placed in a safety cell due to self-harming behavior.   Specifically, jail staff had discovered Mr. Marroquin attempting to strangle himself with a noose he had made from a shirt.

32.     On or about April 29, 2021, Mr. Marroquin was again placed in a safety cell due to self-harming behavior.  He was trying to strangle himself with a towel.

33.     Throughout this period, Mr. Marroquin was experiencing delusions and auditory hallucinations that resulted in him putting his head in the toilet, including uncontrollably drinking water from the toilet.  These symptoms worsened as jail staff cut off contact between Mr. Marroquin and his mom.

34.     Jail staff repeatedly found Mr. Marroquin with his head in the toilet, attempting to drown himself, and Mr. Marroquin was repeatedly transferred to safety cells because of this self-harming behavior.

35.     By May 21, 2021, Mr. Marroquin's psychiatric evaluation still had not been completed, causing the state court to again continue his competency proceedings until June 2021.  (Remarkably, jail staff failed to produce Mr. Marroquin for this June hearing, as well, apparently misrepresenting that Mr. Marroquin had refused to attend court, when he had in fact died.)

36.     On or about May 28, 2021, Mr. Marroquin was again placed in a safety cell due to self-harming behavior.

37.     On May 30, 2021, Defendants Does 1-20 made the decision to transfer, and then transferred, Mr. Marroquin from the jail's psychiatric floor to an Ad-Seg cell.

38.     The decision to transfer Mr. Marroquin was shocking for several reasons, including the fact that he had been under near constant observation for weeks on the jail's psychiatric floor; the fact that the transfer occurred on a Sunday when the staff who usually treated Mr. Marroquin, and who cared about Mr. Marroquin, were off work; and the fact that a clinician with little to no actual knowledge of Mr. Marroquin's condition approved the transfer.

39.     The Ad-Seg cell required only one-hour safety checks.  More alarmingly, the

8

COMPLAINT

Ad-Seg cell was equipped with running water and a toilet.

40.     Mr. Marroquin was, in short, transferred from the most protective cell in the jail (a safety cell) to an Ad-Seg cell that was clearly, unequivocally, and obviously unsafe for Mr. Marroquin.  Several alternatives between these two extremes were available to safeguard Mr. Marroquin's life, including keeping him in EOH, where safety checks would have been conducted at least every fifteen minutes.

41.     During unchecked time in his Ad-Seg cell, Mr. Marroquin predictably stuck his head into the toilet and began drinking, uncontrollably.

42.     Deputies eventually found Mr. Marroquin down in his cell.  He had died from acute water intoxication.

43.     In total, Mr. Marroquin had been placed in a safety cell at least eleven times, and had been placed in EOH at least seventeen times, during his incarceration from December 2020 through May 2021.

44.     At no time during this incarceration by the County was Mr. Marroquin ever taken to a hospital for inpatient psychiatric treatment.  To the contrary, jail staff repeatedly failed to produce Mr. Marroquin for court-ordered psychiatric evaluations and court dates. Had Mr. Marroquin been properly evaluated, it is more likely than not he would have been sent to a state mental health hospital for treatment and stabilization, prior to any continuation of his underlying criminal proceedings.

45.     The County took Mr. Marroquin into its custody then deliberately and recklessly failed to ensure his safety.

**B.     County's Deliberate Indifference to Inmate Safety in County Jails**

      **i.     Disability Rights California's Findings and Recommendations**

46.     Disability Rights California ("DRC") is a nonprofit agency and the largest disability rights group in the nation.  DRC is established under federal law to protect and advocate for the rights of people with disabilities.

47.     DRC opened an investigation into conditions at County jails in 2015.

48.     In April 2018, DRC published its finding: "Suicides in San Diego County

COMPLAINT

Jail: A System Failing People with Mental Illness."

49.    DRC found "an extremely high number of jail inmates with significant mental health treatment needs."

50.    DRC found "significant deficiencies in County's suicide prevention practices."

51.    DRC found the "County's jail system subjects inmates with mental health needs to a grave risk of psychological and other harms by failing to provide adequate mental health treatment."

52.    DRC found "the existing systems of jail oversight have failed" to properly monitor jail conditions, implement suicide-prevention practices, and provide adequate mental health treatment practices.

53.    DRC experts identified twenty-four "Key Deficiencies" and provided forty-six recommendations to address deficiencies in the County's suicide-prevention and related mental health treatment delivery efforts.

54.    DRC provided nine components necessary for a correctional suicide prevention program to be effective, including, but not limited to: "Supervision of At-Risk Inmates" and "Suicide Prevention Training."

55.    The County and its policymakers knew of and failed to implement the foregoing recommendations prior to Mr. Marroquin's death, thus substantially contributing to his death.

**ii.    National Center on Institutions and Alternatives' Findings and Recommendations**

56.    Following the DRC Report, Lindsay Hayes, a project director with the National Center on Institutions and Alternatives, assessed the suicide-prevention practices within County jails.  His report, "Report on Suicide Prevention Practices within the San Diego County Jail System," was released in June 2018.

57.    Hayes' Report focused on eight critical components of a suicide prevention policy, which include: staff training, identification/screening, communication, housing,

COMPLAINT

levels of supervision/management, intervention, reporting, and follow-up/mortality-morbidity review.  Based on his on-site assessment, as well as a review of various Sheriff's Department policies and procedures related to suicide prevention, Hayes found several policies inadequate to prevent suicide.

58.    Hayes found "[t]he suicide prevention training requirements . . . are vague." Hayes found that, in 2017, only 31% of deputies and only 73% of medical personnel had received annual suicide prevention training.

59.    Hayes found "various suicide prevention policies provide limited guidance regarding the observation of suicidal inmates, simply stating that custody personnel are required to provide direct visual observation of suicidal inmates 'at least twice in every thirty (30) minute period.'"   Hayes found there was "*no* option in any [Sheriff's Department] policy for constant and continuous observation of inmates at the highest risk for suicide."

60.    Hayes' report set forth thirty-two actionable recommendations.

61.    Hayes "strongly recommended that the [suicide prevention] policy be revised to include a more robust description of the requirements for both pre-service and annual suicide prevention training, to include the duration of each workshop and an overview of the required topics."

62.    Hayes "strongly recommended that possessions and privileges provided to inmates on suicide precautions should be individualized and commensurate with their level of risk."

63.    Hayes "strongly recommended that all . . . suicide prevention policies be revised to include two levels of observation that specify descriptions of behavior warranting each level of observation."  Additionally, "consistent with the standard of care, an inmate identified as potentially suicidal (or placed on suicide precautions after hours by non-mental health personnel) should be immediately referred to a mental health clinician for completion of a suicide risk assessment."

64.    Hayes strongly recommended "officials conduct a comprehensive physical

COMPLAINT

plant review of all jail cells utilized for the housing of suicidal inmates to ensure that they are reasonably suicide-resistant."

65.   The County and its policymakers knew of and failed to implement the foregoing recommendations prior to Mr. Marroquin's death, thus substantially contributing to his death.

### iii.   California State Auditor's Findings and Recommendations

66.   Nearly a year after Mr. Marroquin's death, the County still had not made significant changes to address the record number of inmate deaths and injuries in its jails.

67.   In February 2022, the California State Auditor published a report entitled, "San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to Deaths of Individuals in Its Custody."

68.   The audit concluded that, "Alarmingly, a total of 52 individuals in the San Diego Sheriff's Department's jails died by suicide over the past 15 years, which is more than twice the number in each of the comparable counties."

69.   The audit noted that, "in one case, an incarcerated individual who had previously threatened suicide was released from a safety cell placement and enhanced observation housing. . . . the Sheriff Department's policy at that time did not specify time frames for ongoing follow-up after such placement . . . [and] mental health staff followed up only once with the individual after release from enhanced observation housing . . . . Two weeks after the individual's discharge from enhanced observation housing and about 12 days after the individual's lone follow-up encounter with a mental health clinician, the individual died by suicide."

70.   The audit report further noted, "the Sheriff's Department's records indicate that a deputy did not perform a required safety check in a housing area, in part because of poor communication between this deputy and the station deputy.  One hour after the deputy should have performed this check, sworn staff found an individual in this housing area unresponsive after attempting suicide.  A physician pronounced this individual deceased at the scene after staff and paramedics were unsuccessful at saving the

COMPLAINT

individual's life."

71.    The audit report further outlined several policy changes that consultants and reviewing agencies have recommended to address the number of suicides in County jails, including increasing the frequency of safety checks in Ad-Seg units, using wristbands to identify inmates with a history of self-harm, and giving individuals in EOH access to visits and phone calls.  As of the date of the state auditor's report, however, none of these recommendations had been implemented by the County.

### iv.    County's Pattern and Practice of Failing to Keep Inmates Safe

72.    Mr. Marroquin's death was a foreseeable result of a pattern among Sheriff's Department personnel of failing to keep people safe while in County custody safe.

73.    Inmate injuries and deaths are a foreseeable result of Sheriff's Department personnel <u>ignoring critical information and failing to protect people in the County's care and custody</u>:

    a. On June 25, 2011, Daniel Sisson died from an acute asthma attack made worse by drug withdrawal.  He lay dead for several hours before a fellow inmate found him.  Due to lack of communication between jail staff, jail staff had failed to monitor him.  In a subsequent lawsuit, a jury awarded $3 million.

    b. In September 2012, Bernard Victorianne suffered for five days from drug overdose because jail staff ignored available (yet unshared) information that he had ingested methamphetamine.  Mr. Victorianne was placed in Ad-Seg instead of in a medical unit.  He was eventually found dead in his cell from acute drug intoxication.  The County settled this case for $2.3 million.

    c. In 2014, former U.S. Marine Kristopher NeSmith committed suicide.  Last seen alive about 10:00 p.m. one night, a guard noticed a bedsheet fashioned into a rope.  The deputy then failed to communicate this information to other jail staff or to call for psychiatric intervention.  No

COMPLAINT

other jail staff took any further action.  Mr. NeSmith was later found dead, having hung himself.  The County settled this case for $250,000.

d.  In 2014, Ronnie Sandoval showed obvious symptoms of overdose, yet jail staff did not summon help or treat him for overdose.  Nor did jail staff pass on information regarding Mr. Sandoval's condition during the shift change.  Mr. Sandoval died from drug intoxication.

e.  In 2015, jail personal failed to input critical medical information into JIMS (the jail information database) about Ruben Nunez, leading to Mr. Nunez dying from water intoxication.  One of the jail staff testified she did not know how to use JIMS to add "alerts"—i.e., the most critical information regarding an inmate.  She testified she was never trained to do this.  The County settled this case for $1 million.

f.  In 2016, David Collins suffered traumatic brain injuries after falling twice while suffering from a medical condition that caused difficulty walking. Sheriff's Department personnel had just assumed he was drunk and failed to provide any medical care to him.  A jury awarded Collins more than $12 million.

g.  In 2016, Heron Moriarty committed suicide after jail staff failed to communicate among themselves about the twenty-eight telephone calls his wife had placed to warn jail staff of Mr. Moriarty's suicidal intentions. The County settled this case for $3 million.

h.  In 2018, Paul Silva was killed by Sheriff's Department personnel when they were "extracting" him from a holding cell, where he had been kept with the lights on, and without running water or a bed, for thirty-six hours. Mr. Silva, who struggled with psychosis, died after he failed to immediately comply with Sheriff's Department personnel instructions, and was tased four to nine times while six members of a "tactical team" held him down with a body shield and pressed down on his legs and torso.

14

COMPLAINT

The County settled this case for $3.5 million.

i.   In 2018, Frankie Greer, an army veteran, was put on a top bunk despite Sheriff's Department personnel knowing he had a severe seizure disorder. Mr. Greer had a seizure, fell from his bunk, and sustained traumatic brain injuries.  The County settled this case for $7.75 million.

j.   In 2018, Colleen Garot was booked into Las Colinas women's jail and, despite patently obvious signs of head trauma, she was largely ignored by Sheriff's Department personnel. After falling from a top bunk, being attacked by another inmate, and being ignored while she had a seizure in a safety cell, Ms. Garot had a debilitating stroke.  The County settled this case for $9.5 million.

k.   In March 2019, Ivan Ortiz died by suicide while on suicide precautions on the jail's psychiatric floor.  Mr. Ortiz suffocated himself with a plastic lunch bag (which he should not have had while on suicide precautions). The County settled this case for $1 million.

l.   In 2020, Tanya Suarez, suffering from drug-induced psychosis, was allowed to pull out her own eyes while Sheriff's Department personnel watched and failed to intervene.  The County settled this case for $4.35 million.

74.   Inmate injuries and deaths are also a foreseeable result of Sheriff's Department personnel <u>failing to adequately monitor those in the County's care and custody</u>, including the following examples:

a.   In the case of Mr. Sisson's death in 2011, jail staff failed to check on Mr. Sisson for hours.  Mr. Sisson died during drug withdrawal.

b.   In 2012, as Mr. Victorianne lay on his cell floor, naked and unconscious, none of the deputies conducted proper security check, soft counts, or hard counts.  One deputy was told by an inmate that Mr. Victorianne was not breathing.  This deputy kicked Mr. Victorianne, stated Mr. Victorianne

COMPLAINT

"twitched," and left him to die in his cell.

c.   In 2014, Christopher Carroll, who was severely mentally ill, was placed in Ad-Seg.  While unobserved, Mr. Carroll had smeared blood on the wall of his cell, urinated on the floor, and threw food and feces on the ceiling before hanging himself.  Jail staff failed to conduct proper cell checks despite knowing about Mr. Carroll's condition.

d.   In Mr. Nunez's case, a deputy saw Mr. Nunez in his cell sitting in his own vomit and urine.  Despite seeing Mr. Nunez twice in this condition, this deputy failed to summon help or take Mr. Nunez to medical services.  The deputy left Mr. Nunez in his cell to die.

e.   In Mr. NeSmith's case in 2014, a jail deputy saw Mr. NeSmith attempting suicide, but took no action to stop Mr. NeSmith or to call for psychiatric intervention.

f.   In February of 2016, Richard Boulanger hung himself in his cell.  His cellmate pressed the emergency all button, but no deputy came to the cell for approximately 20 minutes.  A subsequent investigation revealed that one of the deputies did not break stride or look into Mr. Boulanger's cell during a cell check.  The investigation revealed that during cell checks, the deputy peered into each cell for approximately once second in violation of policy.  The investigation further revealed a practice in which the deputies were turning off the sound of the emergency call buttons, lowering the volume, or muting the inmate intercom system so that no sound could be heard.  Call buttons in many of the housing units did not function, which made no sound when pressed.  The audio for the monitor in the jail tower did not function well so that it was difficult to hear tones and sounds from the monitor even when the volume was turned to the maximum level.

g.   In Mr. Ortiz's case, he was supposed to be on fifteen-minute checks, but

16

COMPLAINT

jail staff failed to check on him for almost an hour at one point, allowing
him time to complete suicide.

75.     Mr. Marroquin's death was, in summary, a foreseeable result of Sheriff's
Department personnel ignoring critical information, failing to protect people in the
County's care and custody, and failing to adequately monitor individuals in the County's
care and custody.

**C.     Mr. Marroquin's Wrongful Death**

76.     Does 1 through 20 were deliberately indifferent to, and recklessly
disregarded, Mr. Marroquin's health, safety, and welfare.

77.     Does 1 through 20 failed to appropriately house and monitor Mr. Marroquin,
(an individual under their care and custody who they knew was suffering from psychosis
and was actively engaged in self-harming and suicidal behaviors) by failing to, among
other things, provide him with access to adequate psychiatric care, diligently monitor him,
and ensure he did not have access to the means to harm himself.

78.     Does 1 through 20 had no reasonable justification, and in fact acted recklessly,
when they transferred Mr. Marroquin from a safety cell to an Ad-Seg cell with running
water and only one-hour safety checks.  Defendants knowingly placed Mr. Marroquin in
a situation, knowing he faced a grave risk of death in that situation.

79.     As an actual and proximate result of Defendants' deliberate and reckless
indifference to Mr. Marroquin's safety and wellbeing, Mr. Marroquin suffered damages
prior to his death, including those arising from his pre-death pain and suffering, in an
amount to be proven at trial.  Ms. Marroquin, moreover, suffered damages arising from
Mr. Marroquin's wrongful death and the conscience-shocking deprivation of her parent-
child relationship with Mr. Marroquin, including economic damages in the form of funeral
expenses and non-economic damages including, including loss of love, companionship,
comfort, care, assistance, protection, affection, society, and moral support.

/ / /

/ / /

COMPLAINT

# V.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION – 42 U.S.C. § 1983 – Violation of Fourteenth Amendment – Deliberate Indifference to Serious Medical Needs

### (By Ms. Marroquin, As Mr. Marroquin's Successor In Interest, Directly Against Does 1 Through 20)

80.    All prior paragraphs are incorporated herein by this reference.

81.    Ms. Marroquin asserts this cause of action as Mr. Marroquin's successor in interest.

82.    On May 30, 2021, Mr. Marroquin was a pretrial detainee in Defendants' custody.

83.    At all times relevant to this cause of action, Defendants were acting under color of state law.

84.    On May 30, 2021, Defendants subjectively knew (or, objectively, should have known) that Mr. Marroquin faced serious medical risks and had serious medical needs, including mental health issues that made him a danger to himself.

85.    Despite this knowledge, Defendants were deliberately indifferent to Mr. Marroquin's serious medical risks and needs by, among other things, transferring Mr. Marroquin from a safety cell to an Ad-Seg cell; by failing to provide Mr. Marroquin access to adequate psychiatric care; by providing Mr. Marroquin with the means to self-harm and complete suicide (e.g., running water); and by leaving Mr. Marroquin unmonitored for unsafe periods of time thus allowing him to self-harm and ultimately complete suicide.

86.    By being deliberately indifferent to Mr. Marroquin's serious medical risks and needs, Defendants violated Mr. Marroquin's Fourteenth Amendment right to be free from such deliberate indifference as a pretrial detainee.

87.    As an actual and proximate cause of Defendants' deliberate indifference to Mr. Marroquin's serious medical risks and needs, Mr. Marroquin suffered damages prior to his death, including those arising from his pre-death pain and suffering, in an amount to be proven at trial.

18

COMPLAINT

88.     Defendants, moreover, acted (or failed to act) in deliberate and reckless disregard of Mr. Marroquin's constitutionally protected rights.  Plaintiff thus seeks an award of exemplary damages against these defendants in an amount sufficient to punish their conduct and to deter such conduct in the future.

## SECOND CAUSE OF ACTION – 42 U.S.C. § 1983 – Violation of Fourteenth Amendment – Interference with Familial Relations

### (By Ms. Marroquin, Individually, Directly Against Does 1 Through 20)

89.     All prior paragraphs are incorporated herein by this reference.

90.     On May 30, 2021, Defendants knew Mr. Marroquin had a recent and extensive history of self-harming and suicidal behavior, and he was actively engaged in self-harming behavior, including responding to command hallucinations to hurt himself.

91.     Defendants were not, on this day, faced with rapidly evolving circumstances on May 30, 2021, in the sense that they needed to make split-second decisions.  Rather, it was a routine Sunday.  Mr. Marroquin was safely housed on the jail's psychiatric floor, either in a safety cell or in EOH.  Defendants had time to deliberate and decide how they were going to address Mr. Marroquin's serious medical risks and needs.

92.     Despites their knowledge of Mr. Marroquin's serious medical risks and needs, and the fact they had time to adequately address these risks and needs, Defendants transferred Mr. Marroquin from near constant observation in a safety cell, to an Ad-Seg cell equipped with running water and only one-hour safety checks.  After weeks of Mr. Marroquin being on the jail's psychiatric floor, there was no legitimate correctional reason for Defendants to—apparently out of the blue—transfer Mr. Marroquin to an Ad-Seg cell.  It was so obviously unsafe for Marroquin to be transferred to an Ad-Seg cell, that Defendants' decision to do so *shocks the conscience*.

93.     Mr. Marroquin died as an actual and proximate result of Defendants' conscience-shocking conduct.

94.     As an actual and proximate result of Mr. Marroquin's death, Ms. Marroquin was deprived of her Fourteenth Amendment right as a parent to enjoy the familial

COMPLAINT

companionship and society of her son.

95.    As a direct and foreseeable result of this denial of substantive due process, Plaintiff suffered economic damages in the form of funeral expenses, and non-economic damages, including loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support—all in an amount to be determined at trial.

96.    Defendants, moreover, acted (or failed to act) in deliberate and reckless disregard of Plaintiff's constitutionally protected rights.  Plaintiff thus seeks an award of exemplary damages against these defendants in an amount sufficient to punish their conduct and to deter such conduct in the future.

**THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 – _Monell_ Liability**

**(By Ms. Marroquin, Individually, And As Mr. Marroquin's Successor In Interest, Directly Against County)**

97.    All prior paragraphs are incorporated herein by this reference.

98.    Ms. Marroquin asserts this cause of action as Mr. Marroquin's successor in interest with regard to the violation of his constitutional rights under the Fourteenth Amendment.  Ms. Marroquin also asserts this claim individually with regard to the violation of her own Fourteenth Amendment rights.

99.    These constitutional violations were the actual and proximate result of certain County "policies," including:

      a.  a _de facto_ policy, practice, and custom of ignoring and failing to implement commonsense reforms, recommended by experts to remedy the record-setting inmate deaths and injuries in County jails;

      b.  a _de facto_ policy, practice, and custom of ignoring critical information and failing to protect people in the County's care and custody; and

      c.  a _de facto_ policy, practice, and custom of failing to adequately monitor people in the County's care and custody.

100.    For at least two years leading up to Mr. Marroquin's death, the County's final policymakers were on notice of the foregoing "policies," including the fact that these

COMPLAINT

"policies" were (and are) causing a disproportionate number of deaths and injuries to people in County jails. By failing to implement any reasonable policy changes in response to this crisis, the County has remained deliberately indifferent to the constitutional rights of people in the County's care and custody.

101. If the County is going to take into its custody individuals with serious health issues, the County must provide them with adequate care. The County has, however, consistently failed to provide adequate training, supervision, and resources for its jail staff.

102. Despite the frequency with which Sheriff's Department personnel must work with individuals suffering from mental health issues, for example, jail staff know little if anything about mental healthcare. As such, jail staff frequently leave such individuals unattended, unmonitored, and—even worse—in dangerous situations with obviously dire consequences.

103. The County's final policymakers failed, in summary, to provide adequate training, supervision, and resources necessary for jail staff to perform their duties without violating the constitutional rights of, not only the people in the County's care and custody, but these individuals' spouses, children, and parents, as well.

104. Even after the County's final policymakers were provided with official reports from multiple oversight organizations, notifying them of the dangerous conditions in County jails, policymakers failed to give jail staff the training, supervision, and resources needed to address the problems raised by these oversight organizations.

105. Mr. Marroquin died as an actual and proximate result of the foregoing *de facto* policies, practices, and customs; and as an actual and proximate result of the County's deliberate indifference to the training, supervision, and resource needs of its jail staff.

106. As a result of Mr. Marroquin's death, including the circumstances leading up to and surrounding his death, Mr. Marroquin's Fourteenth Amendment right to be free from deliberate indifference to his serious medical needs and risks was violated. As a result, Mr. Marroquin suffered damages prior to his death, including those arising from

his pre-death pain and suffering, in an amount to be proven at trial.

107.   As a further result of Mr. Marroquin's death, including the circumstances leading up to and surrounding his death, Ms. Marroquin's Fourteenth Amendment right to familial relations was violated.  As a result, Ms. Marroquin suffered economic damages in the form of funeral expenses, and non-economic damages, including loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support—all in an amount to be determined at trial.

<u>**FOURTH CAUSE OF ACTION – Wrongful Death**</u>

**(By Ms. Marroquin, Individually, Directly Against Does 1 Through 20 And Vicariously Against County)**

108.   All prior paragraphs are incorporated herein by this reference.

109.   At the time of his death, Mr. Marroquin had no spouse or issue.  Thus, Plaintiff, as Mr. Marroquin's parent, has standing to assert a cause of action for the wrongful death of Mr. Marroquin.  *See* Cal. Civ. Proc. Code § 377.60.

110.   As alleged herein, Mr. Marroquin died as a result of Defendants' tortious conduct, to wit, Defendants' deliberate indifference to Mr. Marroquin's serious medical risks and needs.  Mr. Marroquin's death was, therefore, "wrongful" for purposes of a claim for damages under California Code of Civil Procedure section 377.60.  *See Estate of Prasad v. County of Sutter*, 958 F. Supp. 2d 1101, 1118 (E.D. Cal. 2013).

111.   As a direct and foreseeable result of Mr. Marroquin's wrongful death, Ms. Marroquin suffered economic damages in the form of funeral expenses, and non-economic damages, including loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support—all in an amount to be determined at trial.

112.   Because Does 1 through 20 are directly liable for Mr. Marroquin's wrongful death, the County is vicariously liable for all damages arising from his wrongful death, pursuant to California Government Code section 815.2.

**VI.   PRAYER FOR RELIEF**

113.   Pursuant to the foregoing causes of action, Plaintiff prays for the following

22

COMPLAINT

relief:

    a.    on all causes of action, that judgment be rendered in favor of Plaintiff and against Defendants;

    b.    on all causes of action, that compensatory damages (including economic and noneconomic damages) be awarded as permitted by federal and state law, in amounts to be determined at trial;

    c.    on the First and Second Causes of Action, that punitive damages be awarded in an amount sufficient to deter and make examples out of these individuals, to be determined at trial;

    d.    reasonable attorney fees, expenses, and costs of suit pursuant to 42 U.S.C. § 1988 and all other relevant statutory or case law; and

    e.    any and all other relief in law or equity to which Plaintiff may be entitled and which this Court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

96.   Pursuant to the Seventh Amendment and Federal Rule of Civil Procedure 38, Plaintiff hereby demands a jury trial on all causes of action asserted herein.

Dated: May 26, 2023              *s/Trenton G. Lamere*

                           Attorney for Plaintiff,

                           Alba Marroquin de Portillo

COMPLAINT